UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Heather A. Taylor

          v.                          Civil No. 12-cv-326-JL
                                      Opinion No. 2014 DNH 164
eCoast Sales
Solutions, Ltd.

**MEMORANDUM ORDER**

The central question in this case, like in many employment cases, turns on why the defendant fired the plaintiff.  Heather A. Taylor has sued her former employer, eCoast Sales Solutions, Ltd., alleging that she was fired for working from home, and then taking a leave of absence, due to documented medical complications from her pregnancy and childbirth.  She claims violations of (A) the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615(a)(1), (B) the New Hampshire Law Against Discrimination, N.H. Rev. Stat. Ann. § 354-A:7, VI(b), and (C) Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e(k), e-2(a)(1).  This court has jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1367 (supplemental jurisdiction).

eCoast has moved for summary judgment, see Fed. R. Civ. P. 56, arguing that no rational jury could conclude that Taylor's working from home or taking leave during her pregnancy played a prohibited role in her firing.  Yet Taylor testified at her deposition that, while she was working from home on the orders of

her doctors, her immediate supervisor repeatedly told her that
"she needed to be back in the office and [she] shouldn't be out
on leave and working from home due to [her] pregnancy."  Ten days
after Taylor returned from maternity leave, that same supervisor
fired her.

    This evidence--which eCoast simply ignored in its opening
summary judgment memorandum, and incorrectly dismissed as
"unsupported allegations" in its reply--suffices to create a
genuine issue of material fact as to whether working from home
and taking leave due to her pregnancy played an impermissible
role in Taylor's firing, notwithstanding the fact that her
supervisor decided to fire her after receiving information that
Taylor had engaged in misconduct after returning from leave.  In
determining the existence of a triable issue as to the employer's
intent, "the question is not whether a reasonable jury could find
that [the employer] would have fired [the plaintiff] even in the
absence of retaliatory intent.  Rather, the question pertinent to
. . . summary judgment is whether no reasonable jury could find
otherwise."  Travers v. Flight Servs. & Sys., Inc., 737 F.3d 144,
148 (1st Cir. 2013).  That conclusion simply cannot follow from
the record here, which, though eCoast pretends otherwise,
includes Taylor's testimony as to repeated comments by her
supervisor disapproving of her working from home and taking leave

due to her pregnancy.  Based on that testimony, and other record evidence, "it remains plausible that the pre-existing retaliatory motive tipped the scales when the company decided whether [Taylor] had violated company policy in a way that required [her] termination."  Id.  Following oral argument, then, the court denies eCoast's motion for summary judgment, for the reasons set forth in detail below.

## I.   **Applicable legal standard**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if it could reasonably be resolved in either party's favor at trial by a rational fact-finder, and "material" if it could sway the outcome under applicable law.  See Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010).  Importantly, in deciding summary judgment, the court "views all facts and draws all reasonable inferences in the light most favorable to the non-moving" party.  Id.

## II.  **Background**

As required on summary judgment, the following facts are set forth in the light most favorable to Taylor.  See id.  In October 2008, Taylor began working as a sales representative for eCoast,

a company that generates sales leads for technology vendors. During a period of three-plus months in 2009, Taylor worked from home following major foot surgery, and returned to the office to find "everything where it was or should have been."  Taylor's immediate supervisor during that time called her "the highest producer month over month [in] any business unit" and praised her "unending drive for perfection and tremendous work ethic."

In late April 2010, Taylor abruptly quit her job, but after discovering that she was pregnant, reconsidered, realizing that "[i]t was not a time to make major decisions."  In a subsequent conversation with her then-immediate supervisor--as well as with eCoast's CEO, Allen Tait[1]--Taylor explained that she was pregnant, and asked to be rehired.  Tait agreed, and Taylor resumed working at eCoast in early May 2010.  She was assigned to work for a different immediate supervisor, Jon Decolfmacker.

Within a month or so, in early June 2010, Taylor began experiencing complications with her pregnancy, including bleeding.  Initially, her physician ordered Taylor to remain out of work for a week, then cleared her to work from home, first for just "a few hours a day if she is feeling well," then for 30-35 hours a week.  By mid-August 2010, Taylor's doctor ordered that

---

[1]The record is not entirely clear on when Tait became the CEO but, at oral argument, eCoast stated that he "always was," at least at all times relevant to this lawsuit.

she "remain working at home until further notice . . . from 30-35 hours a week only."  Taylor provided documentation of these orders to eCoast, which, as her doctors had directed, allowed her to work from home beginning in early June 2010.

While Taylor was working from home, she communicated daily with Decolfmacker, her supervisor.  During this time, Decolfmacker "made quite a few statements that [she] should be back in that office instead of working from home."  Taylor testified that Decolfmacker made these comments "on numerous occasions," including after he learned, in late July 2010, that her doctor had just ordered Taylor to work from home through mid-August 2010.  At that point, Taylor recalled, Decolfmacker "was telling [her] that [she] needed to get back in the office and that he needed to get a time that [she] was going to be back in the office."  Later, in mid-August 2010, when Taylor told Decolfmacker of her doctor's order "that [she] would be working from home at that point until [she went] out on . . . leave for the baby," Decolfmacker said "he didn't expect that [she] would be out of the office [that] long with [her] pregnancy and that [she] should be back in the office."  Taylor further testified that, "[f]rom August on, [] Decolfmacker repeatedly kept telling [her] that [she] needed to be back in the office and [she] shouldn't be out on leave and working from home due to [her]

5

pregnancy."  He was making these statements, Taylor recalled, nearly "every time" she talked to him.

In early November 2010, Taylor was hospitalized due to complications from her pregnancy, and was placed on FMLA leave. Taylor gave birth to her baby, via an emergency caesarean section, in late December 2010.  After receiving clearance from her doctor, Taylor notified eCoast that she would return to the office on February 28, 2011.  When she did, Taylor was assigned to work at a desk that, in her description, "looked like a dump . . . .  It was layered with dirt.  There was stuff everywhere." Her assigned computer "was huge.  It didn't even fit on the desk. You had to angle it just to get the keyboard on it." Furthermore, in contrast to her prior experience at eCoast (including the time she was working from home between June 2010 and February 2011), Taylor was not given any sales goals or quotas and, when she asked Decolfmacker to assign them, he "told [her] not to worry about it."

On March 8, 2011, eight calendar days after Taylor's return from leave, Decolfmacker asked to meet with her.  In the meeting, he explained that, while eCoast had been monitoring one of Taylor's recent calls to a sales prospect, on March 4, 2011, she

used what he described as "inappropriate language."[2] (eCoast routinely monitored its sales representatives' calls to ensure they were generating valid leads.)  Decolfmacker also informed Taylor that, in another call eCoast had monitored, on March 7, 2011, "there were a number of qualifying questions that she failed to ask," so that "the lead wasn't going to count." Decolfmacker warned Taylor that "she would continue to be monitored on a daily basis" and "to make sure she was working to meet eCoast's expectations based on professionalism and quality."

Also on March 8, 2011, eCoast performed what is known as "quality assurance closed loop monitoring" on two leads that Taylor had submitted, including the lead that Decolfmacker discussed with her at that day's meeting.  (In "closed loop" monitoring, a different eCoast employee contacts the lead to verify the information provided by the representative who submitted it--though, as Decolfmacker acknowledged at his deposition, it "could happen" that, during the looping process, a "prospect could deny saying something that the prospect had said in the original call with the sales rep").  On March 8, the

_____

[2]Decolfmacker told Taylor she had been overheard telling a prospect, "my husband and I were just talking about how tired we are of the damn dogs dropping bombs and pissing all over the snow banks."  While Taylor denied using "inappropriate language," she admitted discussing this subject, explaining that she had "always used this sort of friendly conversation with prospects."

contacts provided information as to their interest in upgrading

their technology that differed from what Taylor had reported,

causing eCoast to conclude that the two leads were invalid.[3]

On March 10, 2011, Decolfmacker met with eCoast's vice

president of human resources, Kim Gibney, to discuss the results

of the closed loop monitoring.  Decolfmacker testified that the

two "discussed that clearly this was a fabricated lead that was

made up and that's a fireable offense and we [] decided to

terminate [] Taylor for the offense."  Gibney then summoned

Taylor and, when she arrived, Gibney and Decolfmacker "reviewed

_____

[3]These two leads were the Millbrae School District and T.W.
Telecom, Inc.  Taylor argues that "[a] key issue in the case
involves the identity of the lead for which [] Decolfmacker
counseled [] Taylor at the March 8 meeting."  She points to
evidence that, in her view, shows that it was the Millbrae School
District--which would contradict eCoast's position, as set forth
in its response to the charge that Taylor eventually filed with
the New Hampshire Commission for Human Rights, that the lead
discussed at the March 8 meeting was T.W. Telecom.  Even if this
is correct, however, it does nothing to change the fact (which
Taylor has not pointed to any evidence to dispute) that eCoast
concluded, based on the closed loop monitoring it conducted on
March 8 (as distinguished from the remote monitoring it conducted
on March 7), that Taylor had submitted false information on both
the Millbrae School District and T.W. Telecom leads.  As
explained infra, however, a rational jury could nevertheless find
that Taylor's working from home, and then taking leave, due to
her pregnancy played an impermissible role in her firing.  In
ruling on eCoast's motion for summary judgment, then, the court
has not placed any reliance on eCoast's claimed misidentification
of the subject of the March 8 meeting between Taylor and
Decolfmacker in its response to the Human Rights Commission.

the results of the report with her and told her that this was a
fireable offense and we were letting her go for that."

Taylor subsequently filed a charge of discrimination against
eCoast with the New Hampshire Human Rights Commission.  In its
written response to the charge, eCoast asserted (among other
things) that Taylor's pregnancy could not have played a role in
her firing since its CEO, Tait--who "was one of the three
individuals who made the decision to discharge [Taylor] on March
10, 2011 (with the decision ultimately being [his])"--was also
the same person "who made the ultimate decision to rehire [her]
in early May 2010," knowing she was pregnant.  eCoast's human
resources manager, Sharon Robitaille, testified at her deposition
in this case that, in or around November 2010, Tait said that
"he had a big problem with people working from home," and told
both Robitaille and Gibney that "he wanted it to stop."

eCoast's written response to Taylor's charge also asserted
that, over the prior five years, the company had fired eleven
employees for providing false leads.  At her deposition, however,
Robitaille--who had verified the assertions in the company's
response by signing it--testified that the only employees whom
she knew "for sure" had been fired "because of false leads" were
Taylor and one other employee, a man (though she acknowledged
that she did not know much about that man's firing because she

was not the director of human resources at that point, Robitaille
testified that she did not believe the man had been issued a
performance improvement notice prior to his termination).

Robitaille also testified about a different male employee
who was issued a performance improvement notice, rather than
being immediately fired, after a lead he had submitted "was
closed looped and found to contain false information"--though she
explained that, in the case of this male employee, "it wasn't
that there was a false lead or false opportunity, but that there
was information that had been embellished."  Robitaille
maintained that this "embellished" lead was not a "false" lead
"according to eCoast's standards," but admitted that those
"standards" are not written down anywhere.  Asked at her
deposition whether, at the time Taylor was fired, eCoast had "any
standards for determining the discipline that would be imposed if
the employee were found to have produced a false lead,"
Robitaille responded that the company "implement[s] a progressive
disciplinary action policy" (consisting of a verbal warning, then
a written warning, then the performance improvement notice, and,
ultimately, termination).  Robitaille testified, however, that
she had approved the firing of employees without first issuing
them improvement notices on occasion--though, as just noted, she

10

could not positively recall having done so in the case of an employee found to have submitted a false lead.

## III. __Analysis__

The FMLA entitles eligible employees to "12 workweeks of leave during any 12-month period" for, among other reasons, "a serious health condition." 29 U.S.C. § 2612(a)(1)(D). eCoast does not dispute that the medical complications Taylor experienced during her pregnancy amounted to a "serious health condition" that entitled her, under the FMLA, to the leave she took beginning in June 2010.[4] eCoast likewise does not dispute that Taylor was independently entitled to that leave under the New Hampshire Law Against Discrimination, which provides, in relevant part, that "[a]n employer shall permit a female employee to take leave of absence for the period of temporary physical disability resulting from pregnancy, childbirth, or related medical conditions." N.H. Rev. Stat. Ann. § 354-A:7, VI(b).

---

[4]Nor does eCoast distinguish between what might be called the "part-time leave" Taylor took while working from home for less than 40 hours each week between June and November 2010 and the full-time leave Taylor took between November 2010 and February 2011, after her doctors prohibited her from working altogether. Following suit, the court has attributed no legal significance to this distinction either.

The FMLA expressly makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the Act.  29 U.S.C. § 2615(a).  Thus, "the FMLA prohibits retaliation against employees who take FMLA leave."  Pagan-Colon v. Walgreens of San Patricio, Inc., 697 F.3d 1, 8 (1st Cir. 2012).  While the New Hampshire Law Against Discrimination does not expressly prohibit retaliation against employees for availing themselves of their right to pregnancy-related disability leave,[5] Taylor suggests that such a prohibition is implicit in the statutory command that an employer "shall permit a female employee to take" such leave, and eCoast does not disagree.

Nor does eCoast disagree with Taylor's suggestion that, if eCoast in fact discharged her because her pregnancy-related medical complications required her to work from home or to stop working at all, that would violate Title VII, which, in relevant part, makes it unlawful for an employer to "discharge any individual . . . because of such individual's . . . sex," 42 U.S.C. § 2000e-2(a)(2), defining "because of sex" to include "because of or on the basis of pregnancy, childbirth, or related

---

[5]The law does, of course, prohibit retaliation against an employee "because he has opposed any practice forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding under this chapter."  N.H. Rev. Stat. Ann. § 354-A:19.

medical conditions," id. § 2000e(k).  Instead, eCoast argues that
Taylor cannot prove that her pregnancy-related medical
conditions, or the accommodations they necessitated, played an
improper role in her termination.

Specifically, eCoast maintains that Taylor cannot make out a
prima facie case that she was fired because she worked from home,
or took leave, due to the medical complications from her
pregnancy.  Even if she could, eCoast continues, Taylor cannot
show a trialworthy issue as to whether eCoast's stated reason for
her discharge--her falsification of lead information--is simply a
pretext for the real reason she was fired, i.e., her working from
home and taking leave due to her pregnancy-related medical
conditions.  The court disagrees on both counts.

"To make out a prima facie case of FMLA retaliation, an
employee must show:  (1) she availed herself of a protected FMLA
right; (2) she was adversely affected by an employment decision;
and (3) there was causal connection between her protected conduct
and the adverse employment action."  Carrero-Ojeda v. Autoridad
de Energia Electrica, ___ F.3d ___, 2014 WL 2786536, at *8 (1st
Cir. June 20, 2014) (quotation marks and bracketing omitted).
The parties agree that the same elements comprise a prima facie
case of retaliation under N.H. Rev. Stat. Ann. § 354-A:7, VI(b)
(with the entitlement to leave under the New Hampshire statute

13

serving as the "right" of which the employee must have availed herself).  Although 42 U.S.C. § 2000e-2(a)(2) prohibits discrimination, rather than retaliation, the parties, as just discussed, have also conceptualized Taylor's Title VII claim as a retaliation theory, insofar as it alleges that she was fired not just because she was pregnant, but because she worked from home and took leave due to the medical complications from her pregnancy.  As a result, the parties agree that Taylor faces the same requirements to establish a prima facie case on her Title VII claim as she does on her claims under the FMLA and N.H. Rev. Stat. Ann. § 354-A:7, VI(b).

In moving for summary judgment, moreover, eCoast does not contest that (1) in working from home, and taking leave, Taylor was availing herself of her protected rights, and (2) she was adversely affected by eCoast's decision to terminate her. eCoast's argument that Taylor has failed to make out a prima facie case on any of her claims, then, rests solely on the notion that she lacks evidence of a causal connection between her protected conduct and her termination.

As discussed in detail above, however, Taylor testified at her deposition that, while she was working from home, her immediate supervisor, Decolfmacker, "repeatedly kept telling [her] that [she] needed to be back in the office and [she]

14

shouldn't be out on leave and working from home due to [her]
pregnancy."  Ten days after Taylor returned to the office from
maternity leave, Decolfmacker fired her.  This evidence readily
suffices to establish a prima facie case of a causal connection
between Taylor's leave and her termination.  See, e.g., Hodgens
v. Gen. Dynamics Corp., 144 F.3d 151, 165 (1st Cir. 1998).

        In arguing to the contrary in its opening memorandum for
summary judgment, eCoast simply chose to ignore Taylor's
deposition testimony as to Decolfmacker's comments, going so far
as to assert that Taylor "is not aware of any derogatory comments
regarding [her] pregnancy leave made by any eCoast employee" and
that she "cannot provide any witnesses that are aware of any
derogatory statements made by any eCoast employees regarding
[her] pregnancy leave or her pregnancy."  These assertions, of
course, overlook the plain fact that Taylor herself is a witness,
who testified at her deposition that Decolfmacker had made such
derogatory comments directly to her.[6]  Confronted with this
testimony in Taylor's summary judgment objection, eCoast argues

_____

        [6]It also overlooks the fact that another witness,
Robitaille, testified that, in November 2010--right around the
time that Taylor stopped working from home in favor of full-time
leave--eCoast's CEO, Tait, said that "he had a big problem with
people working from home" and "he wanted it to stop."  It is a
reasonable inference that Taylor was one of the "people working
from home" whom Tait had in mind when he made these comments.

in its reply that it amounts to "unsupported allegations" of the sort that cannot defeat summary judgment.  That is incorrect.

That "unsupported allegations" and sworn testimony are not the same thing ought to go without saying.  The Court of Appeals, nevertheless, has repeatedly said just that, including in cases where a defendant seeking summary judgment in an employment discrimination case sought, unsuccessfully, to disregard the plaintiff's own testimony as to derogatory remarks by her supervisors.  See Velazquez-Garcia v. Horizon Lines of P.R., Inc., 473 F.3d 11, 18 (1st Cir. 2007) ("provided the nonmovant's deposition testimony sets forth specific facts, within his personal knowledge, that, if proven, would affect the outcome of the trial, the testimony must be accepted as true for purposes of summary judgment"); Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 53 (1st Cir. 2000) ("a party's own affidavit, containing relevant information of which he has personal knowledge, may be self-serving, but it is nevertheless competent to avoid summary judgment") (citing Cadle Co. v. Hayes, 116 F.3d 957, 961 n.5 (1st Cir. 1997)).[7]  Despite this clear authority,

---

[7]"To the extent that affidavits submitted in opposition to a summary judgment motion merely reiterate allegations made in the complaint, without providing specific factual information made [*sic*] on the basis of personal knowledge, they are insufficient." Santiago-Ramos, 217 F.3d at 53.  But Taylor's deposition testimony as to Decolfmacker's remarks is not of that character, and eCoast does not--and could not--argue otherwise.

this is hardly the first case where this court has needed to remind a movant of the basic principle that the other party's testimony counts when it comes to deciding summary judgment. See, e.g., L'Etoile v. New Eng. Finish Sys., Inc., 2008 DNH 163, 14 n.11 ("this court is unaware of any authority . . . requiring a plaintiff to provide [more than] her own testimony to survive summary judgment").

It is hardly an esoteric or difficult concept that summary judgment is appropriate only when the record--including the plaintiff's own competent testimony--fails to demonstrate a genuine issue of material fact.  This court is hopeful that, someday, competent counsel's undoubted awareness of this principle will trump the insistence by certain segments of the bar (undoubtedly driven to some degree by client expectations) on moving for summary judgment in seemingly every case, regardless of the state of the record.  For now, however, all the court can do is deny eCoast's motion for summary judgment, insofar as it argues a lack of causal connection between the plaintiff's protected conduct and her termination by ignoring her testimony as to her supervisor's repeated criticism of precisely that protected conduct.

Based on that testimony, and other evidence of record, Taylor has likewise demonstrated a triable issue as to whether

17

eCoast's articulated reason for firing her was merely a pretext for unlawful retaliation.  The parties agree that, if Taylor can make out a prima facie case of retaliation for working from home or taking leave due to her pregnancy (which, as just discussed, she can), that showing triggers the burden-shifting approach for resolving employment discrimination claims laid out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  Under this approach, since Taylor has established a prima facie case, the burden shifts to eCoast

> to articulate some legitimate, nondiscriminatory reason
> for the employee's termination, sufficient to raise a
> genuine issue of material fact as to whether it
> [retaliated] against the employee.  The employer must
> clearly set forth, through the introduction of
> admissible evidence, the reason for the employee's
> termination . . . .  If the employer's evidence creates
> a genuine issue of fact, the presumption of
> [retaliation] drops from the case, and the plaintiff
> retains the ultimate burden of showing that the
> employer's stated reason for terminating [her] was in
> fact a pretext for retaliating against [her] for having
> taken protected FMLA leave.

Hodgens, 144 F.3d at 160-61 (quotation marks and bracketing by the court omitted).

eCoast argues that it has articulated a legitimate reason for firing Taylor, namely, that she falsified information in two of the leads she submitted, but that she has failed to come forward with evidence creating a genuine issue as to whether that stated reason is a pretext for retaliating against her for

working from home or taking leave due to her pregnancy.  Assuming
that eCoast has "clearly set forth, through admissible evidence,
the reason for [Taylor's] termination,"[8] id., she has
demonstrated a triable issue as to whether that reason was, in
fact, a pretext for unlawful retaliation.

Again, taken in the light most favorable to Taylor, the
record shows that Decolfmacker repeatedly criticized her for
working from home and taking leave due to her pregnancy.  So
construed, the record also shows that, during that brief period
between Taylor's return to the office and her termination, she
was assigned to work at a filthy desk and, for the first time in
her career at eCoast, not given any sales goals or quotas,
despite asking Decolfmacker for them.  Furthermore, the record
contains evidence that eCoast's CEO, Tait, told Gibney (the vice
president of human resources at the time) that he (Tait) did not
like people working from home.  Again, eCoast identified Tait as
the one who ultimately decided to fire Taylor--who had spent
roughly the last five months working from home at the time Tait

---

[8]Taylor argues that eCoast has failed to do so because it
has "produc[ed] no sworn testimony" from Tait, whom, again,
eCoast identified at one point as the ultimate decisionmaker on
her termination.  The court need not reach this argument in light
of its ruling, explained infra, that, even if eCoast has properly
met its burden to show that it fired Taylor for falsifying leads,
she has demonstrated a triable issue that this reason was a
pretext for retaliating against her.

expressed his disapproval of that practice--and has identified Gibney as playing a part in that decision as well.

Presented with this direct and circumstantial evidence of the decisionmakers' animus toward Taylor because the medical complications from her pregnancy required her to work from home and, eventually, to go out on leave, a rational jury could find that this animus, rather than information that she had fabricated two leads, was the real motive for her termination.  Indeed, "[o]ne well-established method of demonstrating pretext is to show that discriminatory comments were made by the key decisionmaker or those in a position to influence the decisionmaker."  Kelley v. Corr. Med. Servs., Inc., 707 F.3d 108, 117 (1st Cir. 2013) (overruling summary judgment for employer, based on an asserted lack of evidence of pretext, where plaintiff's immediate supervisor repeatedly "exhibited her resistance to accommodating [plaintiff's medical condition] through her words and conduct prior to" plaintiff's termination).

There is also the undisputed fact, of course, that eCoast fired Taylor just 10 days after she returned from leave.  "While temporal proximity on its own is insufficient to establish pretext, it is relevant evidence that, combined with other facts, may support such a finding."  Pagan-Colon, 697 F.3d at 10.  Here, again, there are such "other facts," in the form of expressions

20

of displeasure that Taylor had worked from home and taken leave
by some of the very same people who decided to fire her.  On this
record, "a reasonable factfinder could find that [eCoast's]
action against [Taylor] was a disingenuous overreaction to
justify dismissal of an annoying employee who asserted her rights
under the [FMLA and similar laws], rather than the firing of a
[dishonest] employee." Kelley, 707 F.3d at 118 (quotation marks
and bracketing by the court omitted).

    eCoast's response to this evidence (aside from trying to
ignore it) is to emphasize that Taylor "falsified lead
information.  This is contrary to longstanding policies and is a
terminable offense" (citation omitted).  But Robitaille, eCoast's
human resources manager, testified that the company's standard
sanction for submitting a false lead was progressive discipline,
rather than immediate termination, and was unable to definitively
identify any employee besides Taylor who had been fired for such
an infraction without first being issued a performance
improvement notice.  Nor did eCoast submit any other evidence,
such as another employee's testimony, or personnel records,
showing that this had happened to anyone but Taylor.

    eCoast argues that Robitaille's testimony simply
demonstrates that whether "to terminate or put an employee on a
performance improvement plan is an individualized decision

depending on the circumstances."  But that is precisely the
point:  eCoast had no policy or (so far as the summary judgment
record reveals) consistent practice that mandated an employee's
immediate termination upon discovering that he or she submitted
falsified lead information.  Instead, as eCoast states, the
company handled those situations as "individualized decision[s]
depending on the circumstances."  Given the evidence of
retaliatory animus on the part of those who made the decision to
fire Taylor--rather than imposing some lesser discipline--upon
receiving information that she had submitted falsified leads, a
rational jury could conclude that "the pre-existing retaliatory
motive tipped the scales when the company decided whether
[Taylor] had violated company policy in a way that required [her]
termination," amounting to a violation of the FMLA and the other
statutes at issue here.[9]   Travers, 737 F.3d at 144.

        None of this is to deny that, of course, an employer is
entitled to fire an employee for dishonesty, see, e.g., Straughn
v. Delta Air Lines, Inc., 250 F.3d 23, 33-34 (1st Cir. 2001), or

----

        [9]As Travers demonstrates, when retaliatory animus "tip[s]
the scales" in an employer's decision to take adverse action
against an employee, that animus serves as the "but-for" cause of
the adverse action.  737 F.3d at 147-48 (applying "but-for"
causation standard for Title VII claims under Univ. of Tex. Sw.
Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013)).  Like the
Court of Appeals in Travers, this court has assumed without
deciding that this causation standard applies to Taylor's non-
Title VII claims.

that, after hearing the evidence in this case, a jury could reasonably conclude that eCoast fired Taylor for just that reason, rather than because of her pregnancy and the accommodations it required.  Again, though, the question here is not whether a rational jury could find for eCoast, but whether a rational jury could find for Taylor.  See Travers, 737 F.3d 148. Because a rational jury could do so, eCoast's motion for summary judgment must be denied.

## IV.  **Conclusion**

For the foregoing reasons, eCoast's motion for summary judgment[13] is DENIED.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  August 5, 2014

cc:  Benjamin T. King, Esq.
     Kerin Stackpole, Esq.
     Stephen J. Soule, Esq.

---

[13]Document no. 17.